**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | 2:16-cr-00139-2 |
| | ) | 2:17-cr-00334 |
| v. | ) | 2:20-cv-00327 |
| | ) | |
| JEREMIAH DAVIDSON, | ) | Chief Judge Mark R. Hornak |
| | ) | |
| Defendant. | ) | |

## OPINION

**Mark R. Hornak, Chief United States District Judge**

Defendant Jeremiah Davidson is about thirteen (13) months shy of completing a sixty-month in-custody sentence, and about five (5) months away from leaving the "in prison" portion of that sentence. Mr. Davidson currently resides at the Federal Medical Center ("FMC") in Lexington, Kentucky, and he is scheduled to transition to home confinement in January 2021. Placement at FMC Lexington allows Mr. Davidson to receive ongoing treatment and care for his several chronic and progressive conditions, namely his near-end-stage kidney disease and type 2 diabetes mellitus. In May 2019, Mr. Davidson filed an administrative request for compassionate release with the Bureau of Prisons ("BOP") based on his several medical conditions. That request was formally denied by the BOP on April 24, 2020.

Now, Mr. Davidson moves for a Reduction of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), stating that his several medical conditions, as exacerbated by the COVID-19 pandemic, justify compassionate release.[1] (ECF No. 832.) For the reasons stated below, the Court finds that: (1) the Defendant's Motion is properly before it; (2) Mr. Davidson's several

---

[1] The Defendant filed identical Motions at case No. 2:16-cr-00139-2, ECF No. 832 and case No. 2:17-cr-00334, ECF No. 38. Unless otherwise noted, the Court will refer to the filings associated with the case docketed at No. 2:16-cr-00139-2.

1

medical conditions rise to an "extraordinary and compelling" level; and (3) such release is appropriate in light of the Court's consideration of the factors set forth in 18 U.S.C. § 3553(a). Accordingly, the Motion at ECF No. 832 is GRANTED in that the remainder of Mr. Davidson's in-custody sentence will be converted to a term of supervised release with the condition of home confinement, followed by the term of supervised release as imposed as part of his original sentence.

## I.  <u>BACKGROUND</u>

On March 19, 2018, Mr. Davidson pleaded guilty at No. 16-cr-139-2 to conspiracy to possess with intent to distribute and distribute quantities of oxycodone and oxymorphone in violation of 21 U.S.C. § 846, as well as health care fraud in violation of 18 U.S.C. § 1347. (ECF No. 410.) In addition, on that same date, Mr. Davidson waived prosecution by indictment and entered a plea of guilty as to the perjury charge at Count I of the Information at Criminal No. 17-334. (No. 17-cr-334, ECF Nos. 7, 8.) Mr. Davidson was sentenced to an aggregate of sixty (60) months in custody, followed by three (3) years of supervised release. (No. 16-cr-139, ECF No. 522; No. 17-cr-334, ECF No. 24.) As of the date of this Opinion, the BOP lists Mr. Davidson's release date as September 27, 2021. However, Mr. Davidson is due to be released to home confinement in January 2021. (ECF No. 832, at 2.)

At the time of sentencing, the Court was made aware of Mr. Davidson's several health conditions, including chronic kidney disease, diabetes, chronic pain, diabetic peripheral neuropathy, staph infection, hypertension, and elevated cholesterol levels. (ECF No. 475, at 37.) Because of those several conditions, this Court recommended in its Judgment that the BOP place Mr. Davidson at a Federal Medical Center so that he could receive appropriate care. (ECF No. 522, at 2.)

Initially, Mr. Davidson was not placed at a Federal Medical Center. As his physical condition deteriorated, however, Mr. Davidson was transferred to FMC Devens in Massachusetts, and was later transferred to FMC Lexington, where he currently resides. (ECF No. 832, at 2.) Mr. Davidson is currently classified as a "Care Level 3" inmate at that facility (ECF No. 832-7), which is indicative of the fact that he has "complex, and usually chronic, medical or mental health conditions" and that he likely "require[s] frequent clinical contacts to maintain control or stability of [his] condition[s], or to prevent hospitalization or complications." *Care Level Classification for Medical & Mental Health Conditions or Disabilities*, Federal Bureau of Prisons (May 2019), https://bit.ly/3gYZJcw.

Out of all of his conditions, Mr. Davidson's chronic kidney disease[2] appears to be progressing at the fastest rate. Counsel for the Defendant asserts that Mr. Davidson's kidney disease is now classified as "near-end stage." (ECF No. 832, at 2.) And the Defendant's medical records (current as of March 2020) confirm that he is classified as "CKD4," which the Court assumes to mean stage 4 chronic kidney disease. This reading of Mr. Davidson's medical records is consistent with the recent recommendation made by Mr. Davidson's nephrologist that he be "referred for surgery for implantation of an AV fistula," an essential procedure that will ensure that Mr. Davidson is able to receive dialysis once he reaches end-stage.[3] (*Id.*)

---

[2] There are five (5) stages of chronic kidney disease: (1) at stage I, an individual's kidneys function at 90 percent or higher; (2) at stage II, an individual's kidneys function at 60–89 percent, which does not require radical treatment; (3) at stage III, an individual experiences "moderately reduced kidney function" and their kidneys operate at about 30–59 percent; (4) stage IV is marked by "severely reduced kidney function" and an individual "may be feeling quite ill at this stage," as their kidneys only function at about 15–29 percent; and (5) at stage V, an individual's kidneys function at less than 15 percent and they are either waiting for a kidney transplant or are on dialysis. *What are the Stages of Chronic Kidney Disease?*, National Kidney Foundation (last visited August 6, 2020), https://bit.ly/30eB0u8.

[3] *See Preparing for Dialysis (AV Fistula)*, Yale Medicine (last visited August 6, 2020), https://bit.ly/2Wpjpyx ("An AV fistula is a connection that's made between an artery and a vein for dialysis access. A surgical procedure, done in the operating room, is required to stitch together two vessels to create an AV fistula.").

The Defendant also suffers from other chronic conditions which have either continued to progress since the date Mr. Davidson went into BOP custody or appear to be poorly managed at this time. For example, Mr. Davidson has undergone full and partial amputations of tissue on both of his feet in an effort to remedy his diabetic ulcers, but such procedures have not alleviated the bleeding and chronic pain he continues to suffer from. (*See id.* at 3; ECF No. 832-3, at 1.) In addition, Mr. Davidson's medical records indicate that he suffers from hypertension which is "poorly controlled" at this time despite his active prescription for medication meant to abate that condition. (ECF No. 832-2, at 5; ECF No. 832-4, at 1.) And he is also prescribed medication meant to treat his high cholesterol, as well as Vitamin D supplements to compensate for his current deficiency. (ECF No. 832-4, at 1–2.)

On May 1, 2019, Mr. Davidson submitted an administrative request for compassionate release to the Warden of FCI Cumberland (the facility at which he was then housed), initiating the compassionate release process with the BOP and requesting release based on his several medical conditions. (*See* ECF No. 832-6 (specifically mentioning his diabetes, high blood pressure, high levels of potassium, chronic pain, and chronic kidney disease, and referring the Warden to review the medical information on file at FCI Cumberland).) "BOP regional counsel told [counsel for the Defendant] that Mr. Davidson's request was denied by the Warden of FCI Cumberland in 2019, however, there was no written record of that on file." (ECF No 832, at 4.) Due to the lack of written record, "the Warden of FCI Cumberland prepared a written denial dated April 24, 2020, which was sent to Mr. Davidson at FMC Lexington." (*Id.*; ECF No. 832-7.) In reaching that conclusion, the Warden conducted a "thorough review of [Mr. Davidson's] request" and determined that Mr. Davidson's conditions "could be managed" at their current state. (ECF No. 832-7.)

In the time since Mr. Davidson filed his initial administrative request for compassionate release with the BOP, the Secretary of Health and Human Services declared a public health emergency in response to the COVID-19 outbreak, the World Health Organization characterized the COVID-19 outbreak as a pandemic, and the President of the United States declared that the COVID-19 outbreak in the United States constitutes a national emergency. *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, The White House (Mar. 13, 2020), https://bit.ly/3fz5m0J. And this Court has issued nearly twenty (20) Administrative Orders aimed at dealing with that pandemic in the context of the Court's administration of justice.

Then, on April 28, 2020, counsel for the Defendant filed a Motion for Reduction of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). (ECF No. 832.) Essentially, that Motion argues that Mr. Davidson's chronic and progressive kidney disease, along with his other medical conditions—all of which are exacerbated by the COVID-19 pandemic—rise to an "extraordinary and compelling" level, such that compassionate release is warranted. The Defendant therefore argues that the Court should reduce his in-custody sentence to "time served . . . followed by any necessary term of home confinement." (*Id.* at 19.)

In response, the Government argues that Mr. Davidson's Motion should be denied because the Defendant cannot show that "extraordinary and compelling" reasons warrant release and because any reduction in sentence would undermine the original goals of sentencing. (ECF No. 836.) Specifically, the Government argues that: (1) Mr. Davidson is receiving appropriate care while incarcerated; (2) the Defendant's medical conditions, though serious, do not pose a risk of COVID-19 complications; and (3) a reduction of sentence would undermine the

seriousness of the Defendant's crimes, as well as the agreement between the parties that avoided extensive sentencing litigation. (*Id.*)

The Defendant filed a Reply, reiterating that Mr. Davidson's medical conditions are "serious and life-threatening on their own, and undeniably carry a risk of severe illness or death from COVID-19." (ECF No. 837, at 2.) Additionally, counsel for the Defendant argues that given the severity of the Defendant's current medical conditions, he poses little risk to public safety, such that the Court need not worry about undermining the original goals of sentencing if it were to release Mr. Davidson at this time. (*Id.* at 3.) And, in any event, counsel for the Defendant argues that the Court could "address any potential public safety concerns by designating that a period of his supervised release be served on home confinement (including for a period representing his remaining time on his BOP sentence)." (*Id.*)

Then, counsel for the Defendant filed a supplement, informing the Court that Mr. Davidson had tested positive for the COVID-19 virus in early May 2020, and was placed in medical quarantine. (ECF No. 841.) In response to that supplement, counsel for the United States informed the Court that Mr. Davidson had in fact contracted the virus but was presently asymptomatic. (ECF No. 842.) In addition, the Government remained of the position that release of Mr. Davidson was inappropriate, especially in light of the fact that the Defendant appeared to be receiving appropriate care while in custody. (*Id.* at 1.) Counsel for the Defendant filed a Reply, arguing that Mr. Davidson would suffer from adverse effects of contracting COVID-19 regardless of the fact that he was asymptomatic. (ECF No. 843.) Specifically, counsel for the Defendant argues that Mr. Davidson was isolated with other inmates who tested positive for the virus (which is counter to CDC guidance), and that the reality of isolation in prison "is much worse than for those in the community [because] isolation in a prison setting is inherently

punitive, and the need to prevent the spread of COVID-19 among the population at FMC Lexington raises grave concerns that Mr. Davidson will not receive necessary medical care for his numerous conditions." (*Id.* at 2.)

A second supplement was later filed by counsel for the Defendant, advising the Court that as of May 28, 2020, Mr. Davidson had "recovered," and was placed back in general population at FMC Lexington. (ECF No. 849.) The Defendant argues that the Motion at ECF No. 832 is not moot in light of Mr. Davidson's "recovered" status because "the impact of the Defendant's recent diagnosis on his long-term health is unclear at this juncture." (*Id.* at 7.) In addition, counsel for the Defendant takes the position that Mr. Davidson's experience of testing positive for the COVID-19 virus, and subsequently being subjected to quarantine while incarcerated, has made his term of imprisonment much more severe than originally intended by the Court or anticipated by the parties at the time of sentencing, such that release remains appropriate even despite the fact that Mr. Davidson has already contracted the virus. (*Id.*)

Counsel for the United States filed a Response to that second supplement, stating that the Government's position as to the Defendant's Motion had not changed and that release of Mr. Davidson to home confinement remains inappropriate. (ECF No. 853.) In addition, counsel for the United States argues that the Defendant failed to cite any cases or other authority supporting the "notion that a person who recovered from COVID-19 could meet the burden of establishing extraordinary and compelling reasons for compassionate release, and the government's research has revealed none." (*Id.* at 1.)

A third supplement was filed by counsel for the Defendant on July 23, 2020, which reiterates that Mr. Davidson's several medical conditions place him at higher risk of severe illness should he contract the COVID-19 virus (again) and that "[b]oth the World Health

Organization and the CDC caution that it is not yet known whether people who have recovered from COVID-19 can become infected again." (ECF No. 865.) In addition, the Defendant's third supplement attaches a letter from Mr. Davidson's wife, which speaks to several of the § 3553(a) factors that this Court is to consider. (*Id.*)

This matter is now ripe for disposition.

## II.   <u>LEGAL STANDARD</u>

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007); *see also Dillon v. United States*, 560 U.S. 817, 819 (2010) ("A federal court generally may not modify a term of imprisonment once it has been imposed."). One such specific authorization is the First Step Act's amendment of 18 U.S.C. § 3582. As amended, that provision allows a court to modify a defendant's term of imprisonment if "extraordinary and compelling reasons warrant such a reduction." § 3582(c)(1)(A)(i). In addition, the court must consider: (1) whether the defendant has exhausted the appropriate administrative remedies; (2) the factors set forth in 18 U.S.C. § 3553(a) to the extent that they are applicable; and (3) whether such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. § 3582(c)(1)(A).

## III.   <u>DISCUSSION</u>

After considering the relevant factors, the Court concludes that Mr. Davidson's Motion is properly before it, including all of his medical conditions measured in the context of the world as it exists at the time of this Court's determination, and that such consideration extends to factoring in his COVID-19-related concerns. Additionally, the Court concludes that Mr. Davidson's medical conditions, as exacerbated by his particularized risk for severe illness should he contract

the COVID-19 virus, rise to an "extraordinary and compelling" level. And in considering the § 3553(a) factors the Court finds that release of Mr. Davidson to home confinement for the remaining portion of his in-custody sentence would not undo the original purposes of sentencing. As such, the Court will grant Mr. Davidson's Motion for Reduction of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) at ECF No. 832.

## A.  **Administrative Exhaustion**

In order to consider the merits of the Defendant's Motion, the Court must first determine whether Mr. Davidson has complied with § 3582(c)(1)(A)'s exhaustion requirement. Prior to petitioning a court for relief under § 3582(c), a defendant must first file an administrative request for compassionate release with the warden of their facility and then either: (1) fully exhaust BOP's administrative remedies; or (2) wait thirty (30) days from the date their administrative request was filed with the warden. And the Third Circuit recently confirmed that either of § 3582(c)(1)(A)'s options (acting independently) are sufficient to satisfy the exhaustion requirement. *See United States v. Harris*, 812 F. App'x 106, 107 (3d Cir. 2020) (rejecting the argument that a defendant is required to completely exhaust the administrative remedy process if the warden denies a defendant's request within thirty (30) days of receiving it, primarily because "the statute states that the defendant may file the motion [before a district court] thirty days after the warden receives his request").

Here, the Government does not contest the Court's authority to adjudicate the Defendant's Motion based on lack of exhaustion, but the Court believes that it must nonetheless confirm that exhaustion is satisfied because our Circuit has held that § 3582(c)(1)(A)'s exhaustion requirement is mandatory.[4] *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir.

---

[4] A number of courts have addressed the issue of whether § 3582(c)(1)(A)'s exhaustion requirement is jurisdictional. *United States v. Davis*, No. 17-cr-69, 2020 WL 3976970 (M.D.N.C. July 14, 2020) (collecting cases). Most have

2020) (mandating "strict compliance" with § 3582(c)(1)(A)'s exhaustion requirement); *see also United States v. Alam*, 960 F.3d 831, 833 (6th Cir. 2020) ("Even though [§ 3582(c)(1)(A)'s] exhaustion requirement does not implicate our subject-matter jurisdiction, it remains a mandatory condition.").

As the Court sees things, the assessment of fulfillment of the exhaustion requirement in Mr. Davidson's case requires some additional analysis for two (2) reasons: (1) Mr. Davidson's request for release was put before the Warden of FCI Cumberland, not before the Warden of his current facility; and (2) Mr. Davidson did not explicitly identify his COVID-19-related concerns in writing in his administrative request to the BOP because the COVID-19 pandemic did not

---

concluded that the exhaustion requirement does not go to a court's adjudicatory power in the nature of "subject matter jurisdiction" but is better considered as akin to a "claim-processing rule" that limits a court's remedial authority when properly raised. *See, e.g.*, *United States v. Alam*, 960 F.3d 831, 833–34 (6th Cir. 2020) ("In appearance, [§ 3582(c)(1)(A)'s exhaustion requirement] looks like a claim-processing rule, and in operation it acts like one."). And this Court believes that such an approach is the better view, since the statute itself does not purport to strip the district courts of adjudicatory authority. What we do know is that in our Circuit, the exhaustion requirement is a gateway to relief because "[w]hether jurisdictional or not, [exhaustion under § 3582(c)(1)(A)] is clearly a mandatory requirement, as made clear by the Third Circuit in *Raia*." *United States v. Somerville*, --- F. Supp. 3d ----, 2020 WL 2781585, at *5 (W.D. Pa. May 29, 2020); *see also United States v. Contreras*, No. 17-cr-1872, 2020 WL 4530738, at *2 (S.D. Cal. Aug. 6, 2020) ("This Court need not reach the jurisdictional question because even if the exhaustion requirement in § 3582(c) is non-jurisdictional, it is mandatory and precludes the Court from modifying Defendant's sentence."). While categorization of the exhaustion requirement remains an open question in our Circuit, it appears to this Court to not limit the Court's authority to adjudicate the claim, but also appears to be somewhat hybrid in nature, given the verbiage that our Court of Appeals applied in *Raia* regarding its mandatory nature. *See Raia*, 954 F.3d at 597 ("Given BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added— and critical—importance.").

In addition, in *Alam*, the Sixth Circuit analogized the exhaustion requirement in § 3582(c)(1)(A) to the administrative filing obligation in Title VII of the Civil Rights Act of 1964. While appealing, such an analog does not appear to be a perfect fit, since in the Title VII context there are at least two (2) entities with an interest in enforcing the administrative hurdle, namely the EEOC or the charged respondent. Here, no similar analog agency is before the Court. While the United States Attorney's Office typically weighs in on the merits of motions for compassionate release that eventually come before a district court, that "agency" does not automatically stand in the shoes of the BOP if the exhaustion requirement is not carried out. And, when the United States Attorney's Office does address a motion for compassionate release, it does not appear to the Court that the central purpose of doing so is to represent the BOP. Thus, the question of whether § 3582(c)(1)(A)'s exhaustion requirement can be waived, forfeited, or conceded, like the administrative filing obligation in Title VII, is not so clear. But resolving that issue does not change the Court's analysis at this juncture because even if the Government concedes (as it appears to do so here) that the exhaustion requirement has been met in Mr. Davidson's case, the Third Circuit's precedential opinion in *Raia* suggests that this Court must confirm that Mr. Davidson has complied with § 3582(c)(1)(A)'s exhaustion requirement to the extent that it is a gateway to the relief he seeks, even if it does not go to the Court's "subject matter jurisdiction."

emerge until after Mr. Davidson's administrative request was first submitted to the BOP, but had certainly reached full impact while the BOP was considering that request. In addressing each issue in turn, the Court finds that exhaustion in Mr. Davidson's case is satisfied.

### 1. The Appropriate Warden to Receive Mr. Davidson's Administrative Request for Compassionate Release

First, the Court must determine whether Mr. Davidson's administrative request for compassionate release was filed with the appropriate warden. The text of § 3582(c)(1)(A) generally states that a defendant shall make their initial request for compassionate release to the "warden of the defendant's facility" and then the thirty-day clock begins to run after that. As noted above, Mr. Davidson submitted a request for compassionate release to the Warden of FCI Cumberland on May 1, 2019 (ECF No. 832-6), which was formally denied in writing by the Warden of that facility on April 24, 2020 (ECF No. 832-7). In the interim, however, Mr. Davidson was transferred to FMC Devens, and was later transferred to FMC Lexington, where he currently resides. (ECF No. 832, at 2.) In other words, Mr. Davidson's administrative request was submitted to the warden of his prior BOP facility, not his current facility. So, the question becomes: Does Mr. Davidson's administrative request for release cut it?

In the Court's estimation, the answer to that question is "yes." Our Circuit has held that "[g]iven BOP's shared desire for a safe and healthy prison environment . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Raia*, 954 F.3d at 597. In essence, the exhaustion requirement recognizes that BOP "is better positioned than the courts to first assess issues such as a defendant's health, the adequacy of the measures taken by a particular place of incarceration to address any health risks, the risk presented to the public by a defendant's release, and the adequacy of a defendant's release plan." *United States v. Edwards*, --- F. Supp. 3d ----, 2020 WL 1987288, at *4 (M.D. Tenn. Apr. 27,

2020) (citing *Raia*, 954 F.3d at 597). And allowing a defendant's request from a prior facility to start the thirty-day clock does not impede that policy—the BOP still has had its opportunity to try to resolve the issue at an administrative level before the defendant sought relief in federal court. *See United States v. Partida*, No. 17-cr-8260, 2020 WL 3050705, at *4 (D. Ariz. June 8, 2020) (addressing a similar situation and finding that exhaustion was satisfied because thirty (30) days had passed since the warden at the facility the defendant was initially placed at had received the defendant's request for compassionate release). In other words, Mr. Davidson's transfer (from a BOP facility to another BOP facility) did not change the fact that the BOP was aware of his administrative request for release, nor did his transfer impede the BOP's ability to resolve his request at the administrative level.

In addition, if an administrative request for compassionate release is received at a location that is not the "defendant's facility," it appears that the BOP will route such a request to the appropriate person at the appropriate facility. *See* 28 C.F.R. § 571.61(b) ("The Bureau of Prisons processes a request made by another person on behalf of an inmate in the same manner as an inmate's request. Staff shall refer a request received at the Central Office to the Warden of the institution where the inmate is confined.").

In sum, Mr. Davidson is not barred from bringing a motion for compassionate release before this Court because he initiated the compassionate release process at a BOP facility from which he was later transferred for medical reasons. Mr. Davidson initiated the compassionate release process with the BOP by filing an administrative request for release with the warden of the facility at which he was then residing, and the BOP had more than thirty (30) days to consider that request. In that way, he followed the rules. Mr. Davidson's transfer in the interim does not change the fact that the BOP had the first crack at resolving the issue. And that is

especially so because Mr. Davidson essentially maintains no control over the BOP facility at which he resides. *See* 18 U.S.C. § 3621 (providing the BOP with the sole authority and discretion to designate the place of a defendant's confinement).

### 2.   This Court's Consideration of Mr. Davidson's Progressive Medical Conditions in the Context of the COVID-19 Pandemic

The next matter to be considered as to exhaustion is that Mr. Davidson did not reference COVID-19 in his administrative request for release that was submitted to the Warden in 2019 and which was denied in April 2020, and he now asks this Court to consider such concerns when ruling on his Motion for Reduction of Sentence. As such, the question becomes whether this Court can consider the progression of Mr. Davidson's medical conditions in the time since he first filed his administrative request for compassionate release in 2019, including among other things, those medical conditions considered in the context of the emergence and now patently obvious existence of the COVID-19 global pandemic, and the fact that he has since tested "positive" for the COVID-19 virus.

After considering § 3582(c)(1)(A)'s text, the relevant caselaw on the topic, the practical realities of Mr. Davidson's situation, the administrative actions that he has taken, the past and current actions that the BOP has and is taking, and the central premise of the First Step Act, the Court concludes that the answer to that question is plainly "yes." For the reasons set out below, the Court finds that Mr. Davidson's COVID-19-related concerns were squarely before the BOP at the time it reviewed and denied his administrative request in April 2020, and well over thirty (30) days have passed since the BOP became aware of Mr. Davidson's COVID-19-related concerns and denied his request for release. As a matter of both fact and of law, Mr. Davidson has fulfilled the exhaustion requirements.

### i.  <u>Section 3582(c)(1)(A)'s Text</u>

As an initial matter, the text of § 3582(c)(1)(A) does not inform the Court of whether Mr. Davidson was required to record his COVID-19-related concerns in writing in order for the Court to now consider his reference to COVID-19 in the motion currently pending before it. Prior to the enactment of the First Step Act, only the Director of the BOP could file a motion for compassionate release. The First Step Act, however, amended § 3582 to permit an inmate to file a motion in federal court seeking compassionate release, but only after exhausting "all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

Section 3582(c)(1)(A), however, does not define the scope of the Court's review once a motion for compassionate release is otherwise before it. Rather, the statute "delineates the process for a party to obtain judicial review." *United States v. Scparta*, --- F. Supp. 3d ----, 2020 WL 1910481, at *4 (S.D.N.Y. Apr. 20, 2020) ("[T]he exhaustion requirement . . . merely controls who—the BOP or defendant—may move for compassionate release and when such a motion may be made. It simply delineates the process for a party to obtain judicial review, not referring [to] the adjudicatory capacity of the courts.") (quoting *United States v. Haney*, --- F. Supp. 3d ----, 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020)). Put a bit differently, the plain text of the statue speaks to the timing of motions submitted to a federal district court for compassionate release—not to their substance.[5] As such, the Court must look elsewhere to determine *what* it may consider at this juncture.

---

[5] And while 28 C.F.R. § 571.61 outlines the process for submitting an administrative request for compassionate release to the warden, requiring the request to contain "at a minimum . . . [t]he extraordinary or compelling circumstances that the inmate believes warrant consideration," that provision does not resolve the issue presently before the Court in that it does not define the reviewing court's scope.

ii. **Relevant Caselaw**

Similarly, in reviewing the relevant caselaw on the topic, the Court finds that "[t]he few district courts that have addressed [the question of whether a defendant must exhaust each "issue" that they intend to bring before a district court] disagree on whether a defendant must specifically mention the COVID-19 pandemic in a BOP administrative request for compassionate release." *United States v. Smith*, --- F. Supp. 3d ----, 2020 WL 2844222, at \*6 (N.D. Iowa June 1, 2020). And the holding of the Third Circuit's precedential opinion in *United States v. Raia*, 954 F.3d 594 (3d Cir. 2020), does not resolve the issue because the defendant in *Raia* did not make *any* release request to or within the BOP before proceeding to federal court. In addition, when Mr. Raia did proceed to federal court, he asked the court of appeals to consider his motion for compassionate release in the first instance. Simply put, this is a different situation.[6]

One line of those referenced District Court cases holds that a court considering a motion for compassionate release may only consider the *exact information* that the defendant put before the BOP via their administrative request. Under such a "mirror image" approach, typically applied in cases in which the BOP had "closed out" consideration of the defendant's

---

[6] In *Raia*, the petitioning inmate had never filed any administrative compassionate relief request with the warden or otherwise in the BOP, and the Court of Appeals therefore declined to consider the defendant's motion for compassionate release in the first instance, stating that § 3582 requires such a motion to be brought before the sentencing court. 954 F.3d at 596. Additionally, the court of appeals noted that remand to the district court would be futile because the defendant failed to comply with § 3582(c)(1)(A)'s exhaustion requirement in that he did not allow the BOP thirty (30) days to consider his request for compassionate release, nor did he exhaust the remedies available to him through the BOP *because he did not submit any request at all to the BOP. Id.* at 597. As such, in the context of a defendant that made no submission at all to the warden, the Court of Appeals observed that § 3582(c)(1)(A)'s exhaustion requirement presented a "glaring roadblock foreclosing compassionate release." *Id.* (requiring "strict compliance" with § 3582(c)(1)(A)'s timing requirement). Thus, the situation in *Raia* was fundamentally different than that present here, where Mr. Davidson filed an administrative petition with the BOP, far more than thirty (30) days have elapsed since he did so, and the COVID-19 pandemic and the BOP's public response to it emerged prior to the BOP's written denial of Mr. Davidson's administrative request for release. Further, in *Raia*, the BOP had considered nothing about Mr. Raia's specific situation, since he had not asked it to consider anything at all. That differs from the case currently before the Court, where the BOP would have considered Mr. Davidson's entire health situation as of the date the Warden denied his administrative request in writing.

administrative request before the emergence of the COVID-19 pandemic, a court should exclude from its review any new information or change in circumstance that has occurred since the date of the defendant's initial request before the BOP. And, particular to Mr. Davidson's case, if this Court were to follow such an approach it would be unable to consider anything at all outside of his initial request to the Warden, notwithstanding the fact that the Warden went beyond the "four corners" of that request and actually conducted a "thorough review" of Mr. Davidson's overall health status. (*See* ECF No. 832-7.)

For example, the court in *United States v. Wilson* held that a reviewing court could not consider reasons for release that were not specifically put before the BOP via the defendant's administrative request for compassionate release. No. 14-cr-209, 2020 WL 1975082, at *4 (E.D. Pa. Apr. 24, 2020) ("Even in the context of the COVID-19 pandemic, we are directed by our Court of Appeals in *Raia* '[g]iven the BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance."). In *Wilson,* the defendant initially filed a request for compassionate release in Summer 2019 based upon his cancer diagnosis alone. *Id.* at *2. The BOP denied that request in September 2019. *Id.* Then, in April 2020, the defendant filed a motion for compassionate release before the district court based upon his fear of contracting COVID-19 as a compromised at-risk person. *Id.* at *3. The court held that Mr. Wilson's COVID-19-related concerns were not properly exhausted because the BOP had not yet determined whether Mr. Wilson's release was (or was not) warranted for such reasons. *Id.* at *4. In other words, because the BOP had not yet weighed in regarding Mr. Wilson's COVID-19-related concerns, the court held that it could not do so either:

> In the First Step Act, Congress decided [the] Bureau of Prisons should have at least the first chance to determine a prisoner's suitability for compassionate release, and gave the

Bureau of Prisons thirty days to consider a request in light of more general considerations about the conditions, needs at particular facilities and the prison system as a whole, and for the just and proper treatment of the prisoner based on his background and medical history. To enable [the] Bureau of Prisons to make this informed decision envisioned by Congress, the Bureau of Prisons must be fairly put on notice of the grounds for compassionate release. By limiting a prisoner's access to the courts until exercising this requirement, Congress limited [a court's] discretion to excuse a failure to comply.

*Id*.

Similarly, the court in *United States v. Walls* denied a motion for compassionate release that was partially based on the defendant's COVID-19-related concerns. There, the BOP filed a motion for compassionate release on behalf of the defendant in June 2017 based on his deteriorating health condition. *United States v. Walls*, --- F. Supp. 3d ----, 2020 WL 1934963, at *1 (E.D. Mich. Apr. 22, 2020). The court denied[7] that motion in February 2018, and the defendant's daughter later filed a motion for compassionate release on behalf of the defendant on April 14, 2020, seeking release of the defendant in part due to the COVID-19 pandemic. The court denied that second motion for compassionate release on April 22, 2020, because there was no evidence before the court that the April 14, 2020, request for release was ever before the BOP. Additionally, the *Walls* court observed that the defendant's "previous motion for compassionate release—which did not mention [the defendant's] COVID-19 concerns that are central to this most recent motion—does not satisfy § 3582(c)(1)(A)'s requirements, because proper exhaustion necessarily requires the inmate to present the same factual basis for the compassionate-release request to the warden." *Id.* at *3 (finding this to be consistent with the

---

[7] The court's denial was followed by a series of procedural developments: The defendant moved for reconsideration in March 2018, which was denied by the court in May 2018. (*See* No. 92-cr-80236, ECF Nos. 707, 709, 713 (E.D. Mich. 2018).) The court later issued other orders denying various *pro se* motions, which the defendant subsequently appealed. (*See* No. 92-cr-80236, ECF Nos. 724, 725, 726 (E.D. Mich. 2019).) The defendant's appeal challenged the court's denial of his motion for compassionate release, among other things. (*See* No. 19-2020, ECF No. 9 (6th Cir. Nov. 15, 2019).)

Third Circuit's opinion in *Raia*, and stating that "the COVID-19 pandemic does not permit inmates or district judges to bypass § 3582(c)(1)(A)'s mandatory exhaustion requirement").[8]

The court in *United States v. Mogavero* held the same. No. 15-cr-74, 2020 WL 1853754, at *2 (D. Nev. Apr. 13, 2020). There, the defendant submitted an administrative request for compassionate release in 2019 based on her cancer diagnosis, which the BOP denied that same year. Then, in 2020, the defendant filed a judicial motion for compassionate release based on that same concern, as well as the corresponding COVID-19-related risks. The court held that "[p]roper exhaustion necessarily requires the inmate to present the same factual basis for the compassionate-release request to the warden." *Id.* As such, the defendant's motion was denied for failure to exhaust because it was "based on cancer plus COVID-19 exposure risks—and not merely her cancer diagnosis—[a] new calculus [that] was not presented to the warden." *Id.*; *see also United States v. Mendoza*, No. 10-cr-313, 2020 WL 4018222, at *5 (D. Minn. July 16, 2020) (following the approach set forth by *Mogavero* and requiring the defendant to submit an amended administrative request to the warden before the court would consider the defendant's COVID-19-related concerns, which were not mentioned in his initial administrative request).

And the court in *United States v. Valenta* employed a similar approach. No. 15-cr-161, 2020 WL 1689786, at *1 (W.D. Pa. Apr. 7, 2020). There, the defendant filed an administrative request before the BOP on January 7, 2020, which was denied by the BOP on February 6, 2020. That request sought compassionate release based on the defendant's medical issues, but it did not mention the COVID-19 pandemic in any respect. *Id.* The court held that an administrative

---

[8] The day after the *Walls* court denied the defendant's second motion for compassionate release, the Sixth Circuit remanded the case back to the district court. (No. 92-cr-80236, ECF No. 735 (E.D. Mich. Apr. 23, 2020).) On that same day, the district court granted the defendant's motion for reconsideration and released the defendant pursuant to § 3582(c)(1)(A)(i), stating that the motion for reconsideration presents further evidence as to the defendant's "severe medical condition," including how that condition "has worsened over time as his age has advanced" and that such observations were "particularly true in light of the current COVID-19 global pandemic, and the extreme vulnerability to COVID-19 due to Defendant's age and medical conditions." (No. 92-cr-80236, ECF No. 736 (E.D. Mich. Apr. 23, 2020).) That order did not address § 3582(c)(1)(A)'s exhaustion requirement.

request before the BOP "must raise the same claims asserted in the federal court filing"[9] and explained that the defendant's request failed to do just that because "[w]hen the BOP received Valenta's request on January 7, 2020, *it could not have reasonably known about COVID-19.*" *Id.* (emphasis added) (concluding that *Raia*'s holding mandates that "the BOP must be given an opportunity to address Valenta's request for release due to the COVID-19 virus before he can seek relief in this court.").

*Wilson*, *Walls*, *Mogavero*, and *Valenta* might each be read as saying that this Court should not consider any of Mr. Davidson's medical issues or concerns—including the fact that he was later diagnosed with the COVID-19 virus—that he had not personally advanced in writing to the BOP Warden.[10] Those cases, however, are distinguishable from Mr. Davidson's

---

[9] The *Valenta* court relied on the Third Circuit's opinion in *Gadra-Lord v. Doe*, 736 F. App'x 30, 32 (3d Cir. 2018), to reach that conclusion. That case, however, does not address administrative exhaustion within the context of the First Step Act and speaks only to exhaustion as it relates to the Prison Litigation Reform Act.

[10] The Court notes that requiring the "mirror image" approach—inside or outside of the COVID-19 setting—could lead to the anomalous situation in which an inmate would get stuck in a perpetual cycle of never-ending administrative review if there is any change in their own medical condition between the day that they first file their release request with the warden and the day they file in federal court. For example, a defendant whose medical condition changes on a daily or weekly basis would be unlikely to ever achieve a "mirror image" between both their administrative request before the BOP and their motion for release before the district court because their condition would continue to deteriorate while review is underway (thus restarting the 30-day clock every time their symptoms or complications change or further develop). The logical examples of this are almost too easy to list, since the sickest of the sick in any population, confined or not, almost certainly have medical conditions that deteriorate over time, and which also lead to serious collateral impacts beyond a decline in the medical condition that arose first, such as cardiac conditions for those with uncontrolled diabetes and the like. Such a "mirror image" approach would require that an inmate's medical condition be precisely frozen in amber from the date of the first submission of the administrative request for release to the Warden until disposition by a district court. And, should an inmate's condition actually worsen (for whatever reasons and whatever the medical complications) in that time frame, a "wash, rinse, repeat" effect would kick in, with the inmate's medical condition continuing to deteriorate over time, while the inmate would be barred from the very access to the federal courts that Congress viewed as central to the relief provided by the First Step Act.

In the Court's estimation, requiring a defendant to submit a new request for compassionate release any time their medical file is updated would not only burden the BOP's already-strained resources, but it would also be in contravention of the very purpose behind the First Step Act—the prompt consideration for sentence reduction of the most medically compromised inmates in BOP custody. *See Smith*, 2020 WL 2844222 at *7 ("Asking [the defendant] to restart his [compassionate release] process because of the COVID-19 pandemic would be tantamount to telling inmates that they must restart the process each time their condition deteriorates. That, clearly, is not the purpose of the statute."); *United States v. Tidwell*, --- F. Supp. 3d ----, 2020 WL 4504448, at *3 n.27 (E.D. Pa. Aug. 5, 2020) ("Congress did not intend for situations where prisoners—including those like Tidwell with just months left to live—can be trapped in a never-ending loop of attempting to exhaust their administrative remedies.").

case for at least one (1) key reason: the BOP's review of those defendants' administrative requests was complete prior to the emergence (at least with any level of public notoriety) of the COVID-19 pandemic, and critically, prior to the BOP's announced implementation of its own wide-ranging and extensive reviews of the medical and custody situation of *every* BOP inmate in the context of the COVID-19 pandemic (which is detailed below).

In other words, the timing and status of Mr. Davidson's administrative request for relief is fundamentally different from that of the defendants in the cases detailed above in that the BOP administrative process in his BOP "case" had not closed out before the emergence of the COVID-19 pandemic.[11] After all, in *Wilson* the BOP completed its administrative review in 2019, in *Walls* in 2017, in *Mogavero* in 2019, and in *Valenta* in early February 2020. As such, the passage of time and how the BOP has been addressing the COVID-19 pandemic in every case have eclipsed the reasoning of those decisions—at least with respect to how this Court considers those decisions in deciding Mr. Davidson's case—because the timing of the administrative requests in the above-mentioned cases insinuates that the BOP would not have been considering those requests in the context of the COVID-19 pandemic and the BOP's response to it. Indeed, a core aspect of the *Valenta* court's reasoning was that the BOP "could not have reasonably known" of the COVID-19 pandemic at the time its review had concluded. 2020

---

[11] The BOP's review of Mr. Davidson's administrative request for release closed out with its written denial dated April 24, 2020, and that is the benchmark the Court believes that it is to consider. While the BOP informed counsel for the Defendant that Mr. Davidson's request was denied by the Warden of FCI Cumberland sometime in 2019, there was no written record of that denial on file. (ECF No 832, at 4.) And, according to the BOP's own regulations, "[w]hen an inmate's request [for compassionate release] is denied by the Warden, *the inmate will receive written notice* and a statement of reasons for the denial." 28 C.F.R. § 571.63(a) (emphasis added). Accordingly, due to that lack of written record, the Warden of FCI Cumberland prepared a written denial dated April 24, 2020, which was based on a "thorough review of [Mr. Davidson's] request" and after determining that Mr. Davidson's conditions "could be managed" at their current state, presumably as of the date of that denial. (ECF No. 832-7.) The Warden's April 24, 2020, denial did not reference an earlier date on which Mr. Davidson's request was denied, nor did it insinuate that the Warden's denial was based only on a review of Mr. Davidson's file that had occurred on some date prior to April 24, 2020, or that it was simply confirming some earlier administrative action "as of" that date. As such, the Court finds that the BOP conducted a "thorough review" of Mr. Davidson's situation and closed out its internal processes on or about April 24, 2020. That consideration, the timing of it, and that written determination are the operative elements before this Court at this stage of the proceedings.

WL 1689786, at *1. As set out in detail below, that is not the case in Mr. Davidson's proceedings.

That leads the Court to the second and more recently emerging line of cases, which this Court finds to be more persuasive particularly in light of the timing of Mr. Davidson's BOP administrative proceedings. These cases hold that a court may consider the ways in which changing health conditions—including the emergence of the COVID-19 pandemic (or any other relevant intervening circumstance)—impact or exacerbate a defendant's ongoing health conditions. Under this approach, a court is to consider a defendant's evolving medical situation, including but not limited to COVID-19-related concerns, at least when as here the motion has as its central premise the same ongoing health concerns that were identified in the defendant's administrative request for release before the BOP.

For example, in *United States v. Smith*, Chief Judge Strand held that rather than constituting a separate request for compassionate release, a defendant's COVID-19-related concerns simply "increase[] the urgency of [the defendant's] health conditions and potential health outcomes" that were raised in the earlier request before the BOP. 2020 WL 2844222, at *6. There, the defendant submitted an administrative request for compassionate release on October 16, 2019, based primarily on his cancer diagnosis and other health issues. *Id.* at *5. Before the defendant received a response from the warden, he was transferred to another BOP facility and submitted another request for compassionate release before the warden of that new facility on February 3, 2020. *Id.* His request was denied ten (10) days later and he subsequently brought his petition to federal court. *Id.*

None of Mr. Smith's correspondence with the BOP (either in 2019 or 2020) mentioned his COVID-19-related concerns. *Id.* As a result, the Government argued that the defendant failed

to properly exhaust administrative remedies because a defendant's "administrative request must raise the same issues asserted in his motion for compassionate release." *Id.* According to the Government, that approach provides the BOP with the "opportunity to determine whether [defendants are] eligible for compassionate release in light of the COVID-19 pandemic." *Id.* In response, the defendant in *Smith* argued that "the fact that his situation has gotten worse because of the pandemic does not mean that his motion should be denied and he should be required to start the administrative process over again." *Id.*

The *Smith* Court concluded that the defendant "clearly exhausted his administrative remedies" because his "request for compassionate release [was] based primarily on his cancer diagnosis," not his COVID-19-related concerns.[12] *Id.* at *6. In other words, COVID-19 was "simply another factor that exacerbates [the defendant's] ongoing health concerns." *Id.* As such, the court concluded that asking the defendant "to restart his [compassionate release] process because of the COVID-19 pandemic would be tantamount to telling inmates that they must restart the process each time their condition deteriorates. That, clearly, is not the purpose of the statute." *Id.* at *7. *See also United States v. Parker*, --- F. Supp. 3d ----, 2020 WL 2572525, at *8 (C.D. Cal. May 21, 2020) (concluding that exhaustion was satisfied where the defendant "filed an administrative request for compassionate release with the warden based on the same medical conditions which form[ed] the basis for" the defendant's motion before the district court).

Another example is *United States v. Tidwell*, where the court rejected the Government's argument that a district court may only consider a defendant's COVID-19-related concerns if

---

[12] Importantly, Chief Judge Strand's opinion in *Smith* can be contrasted with another of his own opinions on the same topic. *See United States v. Campbell*, No. 03-cr-4020, 2020 WL 3491569, at *4 (N.D. Iowa June 26, 2020) ("I have previously held that a defendant need not mention COVID-19 in his administrative request for compassionate release if his request is based on his health conditions and predates the COVID-19 pandemic. *However, this situation is different. Campbell's initial administrative request did not mention his health in any way.*") (emphasis added).

those concerns were specifically mentioned in the defendant's administrative request before the BOP. 2020 WL 4504448, at *3. First, the court rejected that notion given that the defendant's "request to the warden was predicated on his serious health conditions," which served as the same basis for release before the district court—the "only difference is that the COVID-19 pandemic [had] amplified the risk to his health." *Id.* And, as the court aptly pointed out, "[u]nder the government's theory, every change in Tidwell's condition or in the extent of COVID-19 at [the BOP facility he resided at] would require a new request so that the BOP could assess the exact risk at that moment." *Id.* The court found that to be contrary to the intent of the First Step Act, especially in light of the fact that:

> the BOP already had the opportunity to evaluate Tidwell's health conditions in light of the COVID-19 pandemic. By the time the warden forwarded Tidwell's request with the recommendation that it be given consideration, the COVID-19 pandemic was already a major concern, and the BOP surely was aware of it. As Tidwell points out, on the same day that his request was denied, Attorney General William Barr released a memo to the BOP with instructions to prioritize home confinement as an appropriate response to the COVID-19 pandemic.

*Id.* at *4.

Similarly, in *United States v. Coker* the court found exhaustion to be satisfied even though the defendant had not explicitly mentioned COVID-19 in her administrative request before the BOP. No. 14-cr-085, 2020 WL 1877800, at *3 (E.D. Tenn. Apr. 15, 2020). There, the Government argued that the court could not consider the defendant's COVID-19-related concerns because those concerns were not mentioned in the defendant's April 2019 request for compassionate release, which was based primarily on the defendant's emphysema and chronic obstructive pulmonary disease ("COPD"). *Id.* The court disagreed:

> While it is true that the present motion discusses COVID-19 at length, it does so to illustrate the increasing danger presented by the defendant's previously cited health conditions. The defendant's prior application was based on emphysema, COPD, and her nearly 24 hour per day reliance on oxygen and a wheelchair. The instant motion is based

on those very same conditions. As such, the Court finds that the present motion is not a new request which must be first presented to the BOP.

*Id.*

And the court in *Miller v. United States* held the same. --- F. Supp. 3d ----, 2020 WL 1814084, at *2 (E.D. Mich. Apr. 9, 2020). There, the court found that the defendant "properly exhausted all of his administrative remedies" even though the defendant's 2018 request for release (which was appealed and denied twice) did not specifically mention COVID-19. *Id.* Essentially, the court held that the defendant consistently sought release based on "his myriad of serious health conditions" and that "[t]he COVID-19 pandemic merely accentuates his meritorious claims for release." *Id.*

Thus, Mr. Davidson's COVID-19-related concerns, along with all of his other health conditions, are properly "in the mix" before the Court because those concerns serve to highlight the context and urgency of his overall medical situation, not as a new request for release. On the record before the Court in this case, including the reality (as explained below) that Mr. Davidson's administrative request was formally denied in writing by the BOP in the time frame in which the BOP has told the world that it is considering the condition of *every* BOP inmate in the context of COVID-19, the Court concludes that this approach is the correct one.

But even beyond this Court's conclusion that the approach applied by the court in *Smith* is the one that is true to the text and purpose of the First Step Act (at least with respect to the Act's application to Mr. Davidson's case), the record in Mr. Davidson's case demonstrates that all exhaustion-related goals have actually been accomplished. Given that the fundamental premise of § 3582(c)(1)(A)'s exhaustion requirement is to give the BOP the first opportunity to consider Mr. Davidson's overall medical condition (including consideration of those concerns in the context of the COVID-19 pandemic), and because the record before the Court plainly

24

demonstrates that such consideration in fact occurred by and within the BOP, the purposes of exhaustion have been fulfilled. Thus, as set out below, Mr. Davidson has satisfied the exhaustion requirement set forth in § 3582(c)(1)(A), including as to his COVID-19-related concerns.

### iii.   <u>Application in Mr. Davidson's Case</u>

Here, in considering the practical realities of Mr. Davidson's situation, as well as the above-mentioned caselaw and the very purpose underlying the First Step Act, the Court concludes that it is to consider Mr. Davidson's COVID-19-related concerns in assessing the case now before it.

First, Mr. Davidson's COVID-19-related concerns are not at all "new." The Court agrees with the reasoning of the *Smith* line of cases listed above. In a situation like Mr. Davidson's, COVID-19 is "simply another factor that exacerbates [the defendant's] ongoing health concerns." *Smith*, 2020 WL 2844222, at *6. In the Court's estimation, inclusion of Mr. Davidson's COVID-19-related concerns in the Motion now before the Court simply highlights the ways in which the COVID-19 pandemic has compounded the severity of Mr. Davidson's pre-existing kidney disease and related conditions. Those medical conditions are at the core of both the Motion presently before the Court and the administrative request that was put before the BOP. Mr. Davidson's reference to COVID-19 serves to supplement those core concerns—but it is not an attempt to bring an entirely new request for compassionate release.

In addition, Mr. Davidson's efforts to update the Court regarding the conditions surrounding his core "ask" is no different than any party advising the Court as to any change in circumstance that may impact Mr. Davidson's health more generally. *See United States v. Gamboa*, --- F. Supp. 3d ----, 2020 WL 3091427, at *5 (D.N.M. June 11, 2020) ("In January 2020, when Defendant filed his request with the BOP, and in February 2020 when Defendant

filed his Motion, a pandemic had not yet been declared. Now it has. The Government cites no case law or statute that precludes a party from offering previously unknown new information in support of a party's established position. Certainly, in deciding a defendant's compassionate release motion, the Court may consider all relevant factors."). This would by necessity also include the Government's own efforts in opposing the Defendant's Motion here to advise the Court of the BOP's more recent efforts to mitigate the impact of the COVID-19 virus within its facilities, including the Government's argument that such efforts might serve as one basis upon which to deny Mr. Davidson's request. And any "update" as to Mr. Davidson's health status in general would also encompass the Government's most recent arguments premised on the fact that in the time since Mr. Davidson filed his BOP administrative request, he was infected by the COVID-19 virus and had seemingly recovered. In the Court's estimation, that is a crucial consideration in a case such as the one currently before it, where Mr. Davidson and the Government have both extensively advised the Court as to how they think the Court should consider the post-denial fact of Mr. Davidson's COVID-19 diagnosis.

Second, the record demonstrates that the BOP has already been considering these very same concerns. How do we know that? Because the BOP has said so, loudly and clearly. As of April 5, 2020, about three weeks before the BOP's written denial here, the BOP has been advising the public that it is considering *all* inmates for placement on home confinement (the exact request before the Court in Mr. Davidson's case) because of that very same pandemic:

> **Inmates do not need to apply to be considered for home confinement.** Case management staff are *urgently* reviewing all inmates to determine which ones meet the criteria established by the Attorney General on March 26, 2020 and April 3, 2020. The Department has also increased resources to review and make appropriate determinations as soon as possible.[13]

---

[13] And while any such consideration by the BOP would be pursuant to its authority under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") as opposed to § 3582, that doesn't change the fact that the BOP

*Update on COVID-19 & Home Confinement: BOP Continuing to Aggressively Screen Potential Inmates*, Federal Bureau of Prisons (last updated April 5, 2020), https://bit.ly/2CbBxFg (italicized emphasis added); *see also Tidwell*, 2020 WL 4504448, at *4 (finding that the BOP had the opportunity to evaluate the defendant's health conditions in light of the COVID-19 pandemic, despite the defendant's failure to explicitly mention the pandemic in his administrative request, because the COVID-19 pandemic was already a major concern for the BOP by the time the warden was made aware of the defendant's administrative request for compassionate release).

In other words, in the world as it actually exists now, the BOP at the highest levels has formally stated that it is administratively considering each and every inmate for release to home confinement because of the COVID-19 pandemic, and therefore presumably could so designate Mr. Davidson for home confinement at any time. Thus, there would be no need to "remand" Mr. Davidson back to the BOP so that he could ask the BOP to now undertake internal administrative review of his COVID-19-related concerns, since that is the very same administrative review that the BOP reports that it is nonetheless performing as to each and every federal inmate. *See United States v. Smith*, No. 04-cr-2002, 2020 WL 3913482, at *4 (N.D. Iowa July 10, 2020) ("So long as the defendant's request was denied by the BOP at a time which necessarily entailed consideration of the COVID-19 pandemic, the Court is unconcerned whether the request itself mentioned the pandemic."); *United States v. Hughes*, 16-cr-2039, ECF No. 146, at 8–9 (N.D. Iowa June 23, 2020) (finding that the defendant's administrative request, "despite not mentioning the pandemic, would necessarily invoke consideration of COVID-19 given its timing"). This observation is particularly apt in Mr. Davidson's case because the Warden's denial of Mr.

---

is currently considering (or has already considered) the impact of COVID-19 on each and every inmate in its custody, at least according to the assertion made on its website.

Davidson's administrative request (based on a "thorough review" of his "medical concerns") came several weeks after the BOP had announced that it was considering release to home confinement for every inmate.

If the purpose of exhaustion is to "give the BOP a crack at considering the pandemic," then that purpose has been fulfilled in Mr. Davidson's case. *See Raia*, 954 F.3d at 597 (anticipating that the BOP's "statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic" will be "speedily dispatched" in cases where the defendant's health is at issue in light of the pandemic). According to its own guidance, the BOP does not need a new administrative request in order to initiate the review process that was sought by Mr. Davidson—the BOP is and has been implementing that process since at least April 5, 2020, about three (3) weeks before the BOP's written denial in this case.

Third, the BOP appears to conduct a holistic review of administrative requests for compassionate release in any event, and certainly has already done so in Mr. Davidson's case when the Warden conducted a "thorough review" of Mr. Davidson's request and considered the entirety of his medical situation. Accordingly, Mr. Davidson's COVID-19-related concerns have already been taken into account by the BOP despite the fact that *he* did not explicitly mention those concerns in his administrative request and in light of the fact that the BOP has been directed to consider a COVID-19-based transfer to home confinement for all federal inmates, including Mr. Davidson.

In the Court's estimation, a "thorough" review of Mr. Davidson's situation through the time of the BOP's denial in April 2020 would have necessarily included consideration of the ways in which the COVID-19 pandemic impacted Mr. Davidson's ability to care for himself while incarcerated. And that is especially so given that the Warden's April 24, 2020, denial

acknowledges that Mr. Davidson is currently classified as a "Care Level 3" inmate. So, on some level, the Warden would not have been able to affirmatively state that Mr. Davidson's "Care Level 3" medical conditions could be managed without first considering whether his situation "require[s] frequent clinical contacts to maintain control or stability of [his] condition[s]" and whether any such treatment would be impacted by the BOP's more-recent COVID-19-related policies and practices. *See Care Level Classification for Medical & Mental Health Conditions or Disabilities*, Federal Bureau of Prisons (May 2019), https://bit.ly/3gYZJcw.

And to be sure, unlike the situations in the *Wilson*, *Walls*, *Mogavero*, and *Valenta* cases noted above, in which the BOP processes had closed out well before the inmates came to federal court on later-breaking COVID-19 grounds, here the BOP was well aware of the COVID-19 pandemic at the time it denied Mr. Davidson's administrative request for release on April 24, 2020. *Bureau of Prisons Update on COVID-19*, Bureau of Prisons (Mar. 24, 2020), https://bit.ly/32pdddB (stating that BOP "has implemented its approved Pandemic Influenza contingency plan, modified for COVID-19" since January 2020 and "[o]n March 13, 2020, the Bureau instituted significant measures to prevent the COVID-19 virus from spreading in its facilities."). In addition, Mr. Davidson's request was formally denied after Attorney General Barr directed the BOP to use its "various statutory authorities to grant home confinement for inmates seeking transfer" after considering the "totality of the circumstances for each individual inmate," including their "age and vulnerability . . . to COVID-19." Memorandum from Attorney General to Director of BOP, Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic (Mar. 26, 2020), https://bit.ly/3jd0gtv.

As such, it would be contrary to the BOP's own important public statements as to its own COVID-19-centered concerns and policies to now say that the BOP did not consider Mr.

Davidson's administrative request in the context of the COVID-19 pandemic, or would only do so as to Mr. Davidson if he now personally submitted a new administrative request to the Warden at FMC Lexington. The public pronouncements of the BOP each announce that the BOP is already engaging in that consideration in every case.

Fourth, nonetheless requiring Mr. Davidson to submit a new request to the BOP asking for a consideration it is already engaged in is in contravention of the core purpose of the First Step Act. "[T]he plain language of Section 3582(c) evinces congressional intent that a defendant has a right to a prompt and meaningful judicial determination of whether [they] should be compassionately released." *United States v. Russo*, --- F. Supp. 3d ----, 2020 WL 1862294, at \*6 (S.D.N.Y. Apr. 14, 2020). And that is highlighted by the fact that the statute explicitly provides "a defendant the right to make a judicial motion for compassionate release thirty days after making an application to the BOP," regardless of whether the BOP has completed its review of the request. *Id.*

In other words, Congress intended for rapid review of a defendant's request for compassionate release regardless of whether the BOP had finished (or even begun) its internal consideration. *See United States v. Harris*, 812 F. App'x 106, 107 (3d Cir. 2020) (holding that a defendant is not "required to completely exhaust [the BOP's] administrative remedy process" if the defendant employed § 3582(c)(1)(A)'s alternative approach of filing an administrative request with the warden of their facility and then waiting thirty (30) days before petitioning the district court). This is particularly important given the reality that in considering a compassionate release petition, this Court is not engaged in the review of an administrative decision that is accorded some sort of judicial deference, since the consideration here is *de novo*. *See Beck*, 425 F. Supp. 3d at 587 ("[T]he terms of the First Step Act give courts independent authority to grant

motions for compassionate release and says nothing about deference to BOP, thus establishing that Congress wants courts to take a *de novo* look at compassionate release motions.").

And, in the Court's estimation, that speed is not prioritized if Mr. Davidson would be required to restart the administrative process in the context of the circumstances now before the Court in this case. As Judge Rakoff's opinion in *United States v. Haney* (albeit speaking to whether the administrative exhaustion requirement is waivable altogether) aptly noted:

> [A]nyone familiar with the multiple demands that the BOP has faced for many years in this era of mass incarceration can reasonably infer that Congress recognized that there would be many cases where the BOP either could not act within 30 days on such a request or, even if it did act, its review would be superficial. Congress was determined not to let such exigencies interfere with the right of a defendant to be heard in court on his motion for compassionate release, and hence only limited him to 30 days before he could come to court in the ordinary course. Thus, the reduction of the wait period to a mere 30 days also "unquestionably reflects" a third purpose, i.e., "congressional intent for the defendant to have the right to a meaningful and prompt judicial determination of whether he should be released."

2020 WL 1821988, at *3.

Thus, in considering all of the relevant factors before the Court, including the actual reality of Mr. Davidson's situation; the above-referenced caselaw; and the text of, and the purposes underlying, the First Step Act, the Court concludes that as a matter of fact and of law, Mr. Davidson has met the exhaustion requirements set forth in § 3582(c)(1)(A). As such, the Court may consider Mr. Davidson's overall health condition, including his COVID-19-related concerns as he advances and his positive COVID-19 diagnosis as the United States advances, and will do so as set out below. Mr. Davidson has exhausted his BOP administrative obligations, and the Court will proceed accordingly.

**B.** **"Extraordinary and Compelling" Reasons**

Next, the Court must determine whether Mr. Davidson's several medical conditions, as exacerbated by the ongoing COVID-19 pandemic, rise to an "extraordinary and compelling" level, such that release could be warranted under § 3582(c)(1)(A)(i).

Section 3582 does not define the phrase "extraordinary and compelling reasons." Instead, Congress delegated that task to the Sentencing Commission. *See* 28 U.S.C. § 994(t) (stating that the Sentencing Commission "shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"). The Sentencing Commission defined "extraordinary and compelling" as it related to the BOP's discretion under the pre-First Step Act version of § 3582(c)(1)(A)(i), but has not updated the applicable Policy Statement, found in the U.S. Sentencing Guidelines Manual ("the Guidelines") § 1B1.13, since the First Step Act became law. *See United States v. Rodriguez*, --- F. Supp. 3d ----, 2020 WL 1627331, at *3 (E.D. Pa. Apr. 1, 2020).

Notwithstanding the fact that the relevant portions of the Guidelines predate the passage of the applicable provisions of the First Step Act, and would be advisory in any event, they do provide some initial benchmarks for the Court's consideration. *See id.* at *4 ("[A] majority of district courts have concluded that the 'old policy statement provides helpful guidance, [but] . . . does not constrain [a court's] independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3852(c)(1)(A).'") (quoting *Beck*, 425 F. Supp. 3d at 582). For example, the Policy Statement provides that a defendant may show "extraordinary and compelling" reasons for compassionate release based on the defendant's medical condition, age, family circumstances, or "other reasons." § 1B1.13, cmt. n.(1).

Particular to Mr. Davidson's situation, the Application Notes to § 1B1.13 of the Guidelines speak to conditions which would support compassionate release in the form of two (2) different medical conditions that can rise to an "extraordinary and compelling" level: (1) terminal illnesses; and (2) non-terminal conditions that substantially diminish the ability of the defendant to provide self-care within the correctional environment. Here, the Court finds that the combination of Mr. Davidson's several conditions, paired with the additional risks he faces due to the COVID-19 pandemic, rise to an "extraordinary and compelling" level pursuant to the "non-terminal" option.

### 1. <u>The Terminal Illness Option</u>

First, the Court finds that Mr. Davidson does not yet qualify for relief under the "terminal illness" option, because his kidney failure has not yet reached a "terminal" stage.

The relevant Application Note suggests that a defendant suffers from a "terminal illness" if they are afflicted with "a serious and advanced illness with an end of life trajectory." § 1B1.13, cmt. n.(1)(A)(i). A "specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required" to prove that an illness is "terminal." *Id.* Examples of terminal illnesses provided by the Guidelines include "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia." *Id.*

Several courts have found that end-stage kidney failure rises to an "extraordinary and compelling" level, largely because the relevant Application Note specifically lists "end-stage organ disease" as an example of a "terminal illness." *See, e.g.*, *United States v. Muniz*, --- F. Supp. 3d ----, 2020 WL 1540325, at *2 (S.D. Tex. Mar. 30, 2020); *United States v. Saad*, No. 16-cr-20197, 2020 WL 2065476, at *4 (E.D. Mich. Apr. 29, 2020); *United States v. Williams*, No.

04-cr-95, 2020 WL 1751545, at *3 (N.D. Fla. Apr. 1, 2020); *United States v. Mitchell*, No. 09-cr-26, ECF No. 144, at 6 (N.D. Fla. Feb. 3, 2020).

Here, however, Mr. Davidson's kidney failure has not yet reached end-stage. While it is anticipated that Mr. Davidson will reach end-stage in the not-so-distant future, and that he will require dialysis once he reaches that stage, his kidneys are still operational as of today (albeit only at about 15–29 percent). As such, in relying on the information currently before it, the Court finds that Mr. Davidson does not yet qualify for compassionate release based upon his affliction with a "terminal illness."

## 2. **The Non-Terminal Illness Option**

The Court, however, does find that Mr. Davidson would qualify for relief under the "non-terminal" illness option, especially in the context of the COVID-19 pandemic. The Sentencing Commission's Policy Statement suggests that non-terminal medical conditions may rise to an "extraordinary and compelling" level if "a defendant is suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." § 1B1.13, cmt. n.(1)(A)(ii).

Here, there is no doubt that Mr. Davidson is suffering from a serious medical condition from which he is not expected to recover: chronic kidney disease. Mr. Davidson also suffers from other chronic conditions, including type 2 diabetes, uncontrolled high blood pressure, and high cholesterol, which the BOP is unlikely to ameliorate while he is in custody. Additionally, the record does indicate that Mr. Davidson's diabetes has diminished his ability to care for himself while in custody. (*See, e.g.*, ECF No. 832, at 3 (detailing full and partial amputation of tissue on Mr. Davidson's feet, as well as the persistent bleeding and chronic pain he continues to

suffer from).) And while Mr. Davidson has been prescribed medication to treat his current conditions, at least one of his conditions (hypertension) remains "poorly controlled" at this time. (ECF No. 832-2, at 5; ECF No. 832-4, at 1.)

On top of that, Mr. Davidson is afflicted with several conditions that place him at higher risk of severe illness should he contract the COVID-19 virus. In *United States v. Raia*, the Third Circuit held that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's . . . extensive and professional efforts to curtail the virus's spread." 954 F.3d at 597. In other words, a defendant's motion for compassionate release based in part on COVID-19-related concerns must move beyond "citing to nationwide COVID-19 statistics, asserting generalized statements on conditions of confinement within the BOP, or making sweeping allegations about a prison's ability or lack thereof to contain an outbreak." *United States v. Graham*, No. 12-cr-184, 2020 WL 3053106, at *4 (W.D. La. June 8, 2020) (citing *Raia*).

Here, Mr. Davidson's motion has done just that. The Defendant is afflicted with several conditions that place him at higher risk of severe illness should he (again) contract the COVID-19 virus, such that he is able to differentiate his COVID-19-related concerns from that of other inmates and to explain how his situation rises to an "extraordinary and compelling" level in light of the pandemic. Specifically, the Court reaches this conclusion after considering Mr. Davidson's situation against the backdrop of the CDC's amended list of "high risk" conditions, which distinguishes between underlying medical conditions that *do* place an individual at increased risk and underlying medical conditions that *might* place an individual at increased risk. *See People with Certain Medical Conditions*, Ctrs. for Disease Control & Prevention (last updated Aug. 14, 2020), https://bit.ly/2CrTAqa.

Particular to Mr. Davidson's situation, the CDC includes two (2) of his current conditions on the "do" list. First, the CDC notes that "[h]aving chronic kidney disease of any stage increases [an individual's] risk for severe illness from COVID-19." *Id.* And the same goes for his type 2 diabetes. *Id.* ("Having type 2 diabetes increases your risk of severe illness from COVID-19."). In addition, those conditions are compounded by the fact that Mr. Davidson also suffers from poorly controlled hypertension, which the CDC includes on the "might" list. *Id.* ("Having other cardiovascular or cerebrovascular disease, such as hypertension (high blood pressure) or stroke, may increase your risk of severe illness from COVID-19."). And, all of that is further compounded by virtue of the fact that Mr. Davidson is afflicted with several "high risk" conditions. *Id.* ("The more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19.").

In the Court's estimation, Mr. Davidson's current medical conditions rise to an "extraordinary and compelling" level under the non-terminal option. Not only does he have late-stage kidney disease that is on the verge of qualifying as a "terminal illness," but that condition along with two (2) of his other medical conditions place him at higher risk of severe illness should he contract the COVID-19 virus. The compounded and progressive nature of Mr. Davidson's ailments substantially and materially differentiate his situation from others, such that his conditions appear even more "extraordinary and compelling" for these purposes.

Lastly, the Court does not find that Mr. Davidson's "extraordinary and compelling" situation is diminished by the fact that he has already tested positive for the COVID-19 virus while in custody. As an initial matter, there is currently no medical consensus as to whether someone who has tested positive for the COVID-19 virus—such as Mr. Davidson—will be protected from reinfection. *See Interim Clinical Guidance for Management of Patients with*

*Confirmed Coronavirus Disease (COVID-19)*, Ctrs. for Disease Control & Prevention (last updated June 30, 2020), https://bit.ly/3hPEnyW ("[I]t remains uncertain whether individuals with antibodies are protected against reinfection with SARS-CoV-2, and if so, what concentration of antibodies is needed to confer protection."); *see also* Preetika Rana, *Can You Catch Covid-19 Twice?*, Wall Street Journal (July 8, 2020), https://on.wsj.com/2Dd15lx ("Most scientists say that people who have had COVID-19 gain some immunity to the virus that causes it. What they don't know is whether that protection lasts a few months, a few years or a lifetime.").

And the risk of reinfection appears to be somewhat higher for those who have tested positive for the virus but appear to be asymptomatic, such as Mr. Davidson. *See* Quan-Xin Long, et al., *Clinical & Immunological Assessment of Asymptomatic SARS-CoV-2 Infections*, Nature Medicine (June 18, 2020), https://go.nature.com/3ifR85S (presenting data suggesting that "asymptomatic individuals [have] a weaker immune response to SARS-CoV-2 infection"); *see also* Apoorva Mandavilli, *You May Have Antibodies After Coronavirus Infection. But Not for Long.*, New York Times (June 18, 2020), https://nyti.ms/3g63f4O (suggesting that asymptomatic individuals do not necessarily receive an "immunity certificate" if infected with the COVID-19 virus because the antibodies developed "may last only two to three months, especially in people who never showed symptoms while they were infected").

In addition, the record in Mr. Davidson's case does not indicate that his "recovered" status ensures that he is not currently suffering from lingering or latent effects caused by contraction of the virus (even if unbeknownst to him at this time), or that his long-term health has not been negatively impacted. Rather, just like with Mr. Davidson's risk of reinfection, those aspects remain uncertain, but have not yet been completely ruled out. *See* Quan-Xin Long, et al., *Clinical & Immunological Assessment of Asymptomatic SARS-CoV-2 Infections*, Nature

Medicine (June 18, 2020), https://go.nature.com/3ifR85S (documenting the clinical patterns of asymptomatic infections and finding that many of the asymptomatic individuals studied developed signs of minor lung inflammation while exhibiting no other symptoms); *see also* Apoorva Mandavilli, *Can You Get Covid-19 Again? It's Very Unlikely, Experts Say*, New York Times (July 22, 2020), https://nyti.ms/3faYwOb (stating that while "[i]t may be possible for the coronavirus to strike the same person twice," it is more likely "that some people [will] have a drawn-out course of infection, with the [COVID-19] virus taking a slow toll weeks to months after their initial exposure").

The long and short of it is this: Mr. Davidson initially moved for compassionate release based on his several chronic and progressive medical conditions, all serious then and now, and most of which put him in the "high risk" category with respect to COVID-19. That fact, in the Court's estimation, distinguishes Mr. Davidson's situation from that of a defendant moving for release based solely on fear of contracting the virus. And in a world in which the circumstances surrounding the COVID-19 pandemic in general are fraught with uncertainties, this Court must make its determination based on the concrete information before it. Here, the Court knows for certain that the CDC has deemed Mr. Davidson a "high risk" individual (for several distinct reasons) in light of the pandemic. And without other concrete information to weigh that factor against, the Court finds that Mr. Davidson's several medical conditions, viewed in light of the COVID-19 pandemic, remain "extraordinary and compelling" for purposes of this Court's compassionate release analysis.

### C.  The § 3553(a) Factors

Finally, even though the Court finds that "extraordinary and compelling" reasons could warrant release, it must also consider whether release of Mr. Davidson is appropriate in light of

the factors set forth in § 3553(a). Specifically, "in considering the section 3553(a) factors, [the Court] should assess whether those factors outweigh the 'extraordinary and compelling reasons' warranting compassionate release, particularly whether compassionate release would undermine the goals of the original sentence." *United States v. Bess*, --- F. Supp. 3d ----, 2020 WL 1940809, at *10 (W.D.N.Y. Apr. 22, 2020).

In addition, the Third Circuit recently affirmed that the determination of "whether to reduce an eligible defendant's term of incarceration for compassionate release after considering the § 3553(a) factors is committed to the discretion of the [district court]." *United States v. Jones*, No. 12-cr-38, 2020 WL 3871084, at *4 (W.D. Pa. July 8, 2020) (citing *United States v. Pawlowski*, --- F.3d ----, 2020 WL 4281503, at *2 (3d Cir. June 26, 2020)). That discretion includes the district court's ability to consider the length of the defendant's original custodial sentence, including the portions served and remaining, when weighing the § 3553(a) factors. *Pawlowski*, 2020 WL 4281503, at *2.

Here, the Government argues that any reduction of Mr. Davidson's sentence would undermine the seriousness of the Defendant's crimes, disregard the plea agreement reached by the parties, and discount the Defendant's criminal history. (*See* ECF No. 836.) Essentially, the Government calls upon the Court to focus its consideration on two (2) of the § 3553(a) factors: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the original sentence to deter future criminal conduct and to protect the public from further crimes by the defendant. In looking to those factors, however, the Court does not find that such considerations counterbalance the "extraordinary and compelling" circumstances that warrant Mr. Davidson's release on specified conditions.

As an initial matter, the Court notes that the outcome Mr. Davidson seeks is modification of the remaining five (5) months he has left to serve in a BOP non-community correctional center[14] to supervised release with the condition of home confinement.[15] And while it is true that Mr. Davidson does have a lengthy criminal history and a habit for recidivism, the Court does not find that release of Mr. Davidson to home confinement five (5) months ahead of schedule will negate the original purposes of sentencing. *See United States v. Early*, No. 09-282, 2020 WL 2112371, at *4 (N.D. Ill. May 4, 2020) (stating that "[m]ost reasonable observers looking at [the defendant's] record would find it quite likely that he will commit additional crimes once he is released," but granting compassionate release because the defendant would "very shortly be back in society, irrespective of what the Court does"). Simply put, changing the physical location of Mr. Davidson's confinement over the next five (5) months to the environment into which the BOP has already concluded he would then move is unlikely to diminish the impact of the overall sentence this Court originally imposed, and would not in the Court's judgment diminish the resulting sentence's ability to meet the § 3553(a) purposes of sentencing. Considered as a whole, this is a modification of degree, not kind.

---

[14] As noted above, Mr. Davidson is due to be released to home confinement in January 2021. (ECF No. 832, at 2.)

[15] Pursuant to § 3582(c)(1)(A), a court "may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment)" if all other statutory requirements are met. A court's authority to modify a defendant's term of imprisonment pursuant to § 3582(c)(1)(A) (including releasing a defendant from BOP custody and then imposing supervised release with the condition of home confinement) differs from BOP's authority to transition a defendant to home confinement under the CARES Act. *See United States v. Gordon*, No. 16-cr-82, 2020 WL 3964041 (S.D. Ga. July 13, 2020) ("A defendant's request for home confinement under the CARES Act is different than a request for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). Under § 12003(b)(2) of the CARES Act, if the Attorney General finds that emergency conditions will materially affect the functioning of the [BOP], the Director of the [BOP] may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate. Thus, in placing a defendant in home confinement, the BOP is utilizing its authority under 18 U.S.C. § 3624(c)(2) and 34 U.S.C. § 60541—not the compassionate release provision of 18 U.S.C. § 3582(c)."). In other words, while courts do not have authority under the CARES Act to order the BOP to transition defendants to home confinement, they do have authority under § 3582(c)(1)(A) to modify a defendant's term of imprisonment such that the remaining portion of the defendant's in-custody term is substituted for a period of supervised release with the condition of home confinement. And that is what the Court intends to do in Mr. Davidson's case.

That is not to say that the Court is ambivalent as to Mr. Davidson's future conduct. It is to say, however, that this would be a very different situation if the Court were "simply being asked to fling open the doors to the prison and let Mr. [Davidson] walk out." *Id.* at *4–5. While Mr. Davidson will be released from FMC Lexington, he will still be immediately placed on supervised release status with the condition of home confinement for the remainder of his in-custody term. And, Mr. Davidson will then and thereafter be required to comply with the conditions of release set forth by this Court and enforced by the Probation Office for his entire term of supervised release. That's no small matter.

The time that Mr. Davidson has spent in BOP custody has been considerable and serious. Relieving Mr. Davidson of the requirement of spending the next (and his last) five (5) months in a prison will not in the Court's judgment undermine the imposed sentence's consideration of the seriousness of the offenses of conviction, nor will it diminish the sentence's deterrent effect. That incremental interval, in the Court's judgment, is simply not material to the overall sentencing equation when considered in the context of the entire record now before the Court, not only of Mr. Davidson's offense conduct and prior record, but also of his serious medical conditions.

In addition, the Court finds that requiring Mr. Davidson to remain in custody at FMC Lexington over the next five (5) months would if anything actually result in a sentence that is greater than necessary to fulfill the purposes of sentencing. As stated above, Mr. Davidson has already lived through the experience of testing positive for the COVID-19 virus while incarcerated and being quarantined in a prison setting. In the Court's estimation, that experience has likely made Mr. Davidson's period of incarceration significantly more "laborious and difficult," such that additional time in custody at FMC Lexington is not necessary. *See United States v. Gray*, 416 F. Supp. 3d 784, 790 (S.D. Ind. 2019) ("Mr. Gray has served much of his

sentence while seriously ill. This means that his sentence has been significantly more laborious and difficult than that served by most inmates. It also means that further incarceration in his condition would be greater than necessary to serve the purposes of punishment set forth in § 3553(a)(2).").

      While an earlier transition to supervised release with home confinement is a relatively modest time modification in the overall scheme of things, such a transition will allow Mr. Davidson to take significant precautions to safeguard his health against the very real risks COVID-19 poses to individuals afflicted with several "high risk" conditions. Thus, the Court finds that the "extraordinary and compelling" nature of Mr. Davidson's medical conditions in light of the COVID-19 pandemic is not diminished when considering Mr. Davidson's situation against the backdrop of the § 3553(a) factors. As such, the original goals of sentencing can and will be carried out as Mr. Davidson serves the remainder of his in-custody sentence while on home confinement.

## IV.  CONCLUSION

      The Court has considered the relevant factors set forth in § 3582(c), as well as the applicable policy statements issued by the Sentencing Commission and the factors set forth in § 3553(a). In pairing the practical realities of Mr. Davidson's situation with the fact that Mr. Davidson is entitled to prompt review of his request for compassionate release, the Court concludes that Mr. Davidson has exhausted his BOP administrative obligations, and that his Motion is properly before it, including its consideration of his kidney disease and other afflictions in the context of the COVID-19 pandemic. The Court also finds that Mr. Davidson's medical conditions rise to an "extraordinary and compelling" level and that the original purposes of sentencing would not be impeded by release of Mr. Davidson to supervised release with the

condition of home confinement five (5) months ahead of schedule. That sentence, in the Court's estimation, will remain one that is sufficient but not greater than necessary to fulfill the purposes of sentencing under applicable law.

Accordingly, the Defendant's Motion for Reduction of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) at ECF No. 832 is GRANTED in that the remainder of Mr. Davidson's in-custody sentence will be converted to a term of supervised release with the condition of home confinement, followed by the term of supervised release imposed as part of his original sentence (but without further home confinement), each term of supervised release with all of the conditions of supervised release imposed at the time of sentencing.

An appropriate Order will issue.

        s/ Mark R. Hornak
        Mark R. Hornak
        Chief United States District Judge

Dated:   August 20, 2020

cc:      All counsel of record